**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 20 CR 260 |
| Plaintiff, | ) | |
| | ) | U.S. Magistrate Judge Gabriel A. Fuentes |
| v. | ) | |
| | ) | |
| TIMOTHY O'DONNELL, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The government has moved to detain Defendant Timothy O'Donnell ("Defendant") pending his trial on a felony arson charge stemming from allegations that in the middle of a public demonstration on State Street in downtown Chicago on May 30, 2020, he set a Chicago police car ablaze while wearing a clown-style mask and then posed for photos in front of the flaming vehicle as the demonstration continued around him. His background, according to information provided to the Court, includes a long history of failing to appear in court on a series of arrests for offenses or charges that he characterizes as relatively minor, and only one of them resulted in a felony conviction. His background also includes indications of some severe mental health problems amid ongoing mental health treatment, before he was taken into custody. The Court must conclude whether, under the Bail Reform Act, the government has met either of its respective burdens of showing that no set of release conditions will reasonably assure (1) Defendant's appearance in court as required, or (2) the safety of the community or any other person. 18 U.S.C. § 3142(e).

## BACKGROUND

Defendant is charged in a Criminal Complaint (D.E. 1) of committing arson in violation of 18 U.S.C. § 844(i). More specifically, the Complaint alleges that on or about May 30, 2020,

Defendant held a lit object and placed it in the gas tank of a marked Chicago Police Department vehicle, setting it afire, and then posed for a photograph in front of the burning vehicle. (*Id.* ¶¶ 4-6.) The government proffered at the detention hearing on June 8, 2020, that Defendant remained in the area of the fire for about 15 minutes, sitting down to roll a cigarette. One of the photographs submitted to the Court appears to depict him rolling the cigarette as the flaming police vehicle is visible in the background. (*Id.* ¶ 5.) The Complaint further alleges that Defendant committed the foregoing acts while wearing a mask described by the government as "a 'joker' mask," shown in photographs included in the Complaint as depicting a white clown mask with a wide, eight-tooth grin. (*Id.* ¶¶ 6.) In one of the photographs, the burning police vehicle is in the background, and the person alleged to be Defendant is standing with arms outstretched, wearing the mask, and displaying a neck tattoo with the word "PRETTY" in all capital letters. (*Id.* ¶ 6.) A police "booking photo" of Defendant is also included in the Complaint, and that photo shows the same all-caps tattoo of the word "PRETTY" on Defendant's neck. (*Id.* ¶ 7.) A law enforcement search, authorized by federal warrant, of a Chicago residence associated with Defendant yielded "a 'joker' mask" that is "consistent with the mask shown in the photographs," the government alleges. (*Id.* ¶ 9.) The government further proffered at hearing that the search also resulted in law enforcement's recovery of clothing that appears to match the clothes shown in the photographs. In addition, the government submitted a four-second video showing the person in the clown mask standing at the rear right quarter panel of the police vehicle, the small circular door to its gas tank open, and showing the person holding his hand in the area of the open gas cap area for a full four seconds. We will discuss that video further below.

The government also alleges that on June 2, 2020, Defendant admitted to law enforcement that he was the person shown wearing the mask in the photographs taken at the scene of the burning

police vehicle. (*Id.* ¶ 10.) Defense counsel argued at the detention hearing that Defendant's statements were the product of a three-and-a-half hour interview during which Defendant invoked his right to counsel, continued to be questioned unlawfully, and denied being the person who set the police car on fire. Meanwhile, the images of the burning police car "were quickly broadcast across the nation . . . and seemed to some to represent a city had lost control" during widespread demonstrations in Chicago and elsewhere in the wake of the death of George Floyd a week earlier during his detention on the street by Minneapolis police officers.[1] This Memorandum Opinion explains the Court's conclusion as to the government's detention motion, which Defendant opposes.

## DISCUSSION

### I.     Legal Background:   Detention and Release Under the Bail Reform Act

Under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141–3156, a defendant may be detained in custody pending trial "[i]f, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The judicial officer's conclusion that no conditions of release can reasonably assure the safety of other persons and the community must be supported by clear and convincing evidence, 18 U.S.C. § 3142(f), and the government's burden is by a preponderance of the evidence on the question of whether no conditions of release will reasonably assure a defendant's appearance in court as required. *United States v. Portes*, 786 F.2d 758, 766 (7th Cir. 1985). To detain a defendant, the Court must find that the government met its burden on either of

---

[1] Jason Meisner et al., *The Criminal Charges that Have Emerged in the Aftermath of George Floyd's Death Have Run the Gamut*, Chi. Trib. (June 6, 2020), http://www.chicagotribune.com/news/criminal-justice/ct-chicago-criminal-charges-george-floyd-unrest-20200606-mngxfb2htbfhjgwpip6yohw4ym-story.html.

the two foregoing issues (risk of non-appearance or risk to the safety of the community or any other person), and not both. *United States v. Ramirez*, 843 F.2d 256, 257 (7th Cir. 1988).

The Bail Reform Act generally expresses a "preference for release," in that Section 3142(e) requires the Court to consider the possibility of less restrictive alternatives to detention. *United States v. Fattah*, 351 F. Supp. 3d 1133, 1136–37 (N.D. Ill. 2019) (citing *United States v. Infelise*, 934 F.2d 103, 105 (7th Cir. 1991)). "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). In determining whether there are conditions of release which will reasonably assure the safety of any other person and the community, we are to take into consideration the factors set forth in § 3142(g):

> (g) **Factors to be considered.**—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of Section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including—
> A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

The Bail Reform Act imposes a rebuttable presumption of detention for certain offenses as to which the Court has found probable cause with respect to a defendant, but the charged offense

4

of arson is not among them. 18 U.S.C. § 3142(e)(3). Accordingly, no rebuttable presumption applies, and the Court's analysis will go straight to the Section 3142(g) factors in determining whether detention is required under Section 3142(e). For purposes of the first of those factors, per Section 3142(g)(1), the offense of arson does constitute a "crime of violence" under the Bail Reform Act per 18 U.S.C. § 3156(a)(4)(A), in that arson is a felony that has as an offense element including the use of physical force against the property of another. *See United States v. Mitchell*, 23 F.3d 1, 3 (1st Cir. 1994) (affirming district court's finding that aiding and abetting an arson is a "crime of violence" for purposes of the Bail Reform Act). Arson as charged in this case carries a maximum statutory penalty of 20 years of imprisonment. 18 U.S.C. § 844(i).

## II.     The Court's Analysis of the Section 3142(g) Factors Governing Release or Detention

In this matter, the government has moved for detention on dual grounds: that no set of release conditions will reasonably assure (1) Defendant's appearance in court as required, and (2) the safety of the community or any other person.

### A.     Risk of Flight

The question of whether no set of release conditions will or will not reasonably assure Defendant's appearance in court as required depends heavily on an analysis of Defendant's personal history and characteristics, the third of the Section 3142(g) factors. The Court has little difficulty concluding that Defendant's history of failing to appear in court during various criminal prosecutions, some more serious than others, satisfies the government's burden of showing by a preponderance of the evidence that no release conditions will reasonably assure Defendant's appearance in Court. For purposes of the government's burden of showing that no release conditions will reasonably assure Defendant's appearance, the Court is more concerned with the failures to appear than with the relative seriousness of the charged offenses in his background. The

5

Court sets forth fully below his history of failing to comply with court orders and failing to appear in court.

## 1.    Defendant's Personal History and Characteristics

### a.    Defendant's Repeated Failures to Appear

Defendant's characterization, at the detention hearing, of his criminal history as consisting of relatively low-level offenses looks only at the nature of those offenses and not closely enough at his failures to appear and what they say about the ability of a set of release conditions to reasonably assure his appearance in court in this case. Based on the information supplied to the Court by Pre-Trial Services, Defendant has at least nine failures to appear in courts (or failure to comply with conditions such as reporting to a probation officer) in five different states since 2008, and his failures to appear are not clustered during a time long ago but are repeated and persistent, occurring in 2008, 2010, 2011, 2012, 2013, 2014, and 2016. At the time of the charged offense in this case, Defendant is wanted on an active warrant out of Seattle, Washington, for a failure to appear in court on a concealed weapons charge in September 2016.[2] A brief walk through the factual history of these nine matters is instructive on the question of Defendant's overall stability and reliability for purposes of any release order the Court might enter here.

Defendant is reported to have lived on and off with his mother between 2004 and 2017 in Chicago's Bridgeport neighborhood, and then since 2018 with his mother in an apartment in

---

[2] Defendant, through counsel, argued at the detention hearing that this misdemeanor offense arose from his being in possession of a knife that itself was lawful, but that was concealed in a sheath. Defendant further proffered that he was homeless at the time and released through the intervention of a benevolent third-party organization that wanted to aid his return to Illinois. Although Defendant argued that no action had been taken to execute the warrant or to prosecute the Seattle misdemeanor case, he conceded that nor did Washington authorities quash the warrant, and that the Seattle court that released Defendant – and issued the warrant when he did not appear – expected him to attend his court appearances whether he returned to Illinois or not. The Seattle case might well be less concerning if it were the only failure to appear in Defendant's background, or if it were one of a few. But it is one of many.

Chicago's Pilsen neighborhood. His mother, who works at a full-time job with the State of Illinois and lives part time in a Downstate Illinois village, is proposed as his third-party custodian. Defendant's first reported failure to appear was in 2008 in Chicago, when he was charged in a misdemeanor battery case. Before the case was dropped in 2009, Defendant is reported to have failed to appear while on bond in August 2008, causing a bond forfeiture warrant that was executed later that month.

A year after the Chicago battery case was dropped, he found himself in Ann Arbor, Michigan, where he was accused of felony assault with intent to rob a woman from whom he tried to snatch a purse, apparently unsuccessfully. This matter resulted in his only reported felony conviction, for which he received a suspended sentence of incarceration and term of probation. But the reported record also includes a failure to appear for a September 2010 sentencing hearing, for which a warrant was issued and then executed – back in Illinois. The terms of his probation required him to report to a probation officer in Michigan, but as of April 2011, his third failure to appear arose for not reporting to the probation officer, resulting in another warrant being issued, and in the revocation of his probation, which had included his enrolling in a residential treatment program he failed to complete.

By 2012, Defendant had traveled to Texas (as indicated by an arrest in a matter that was dismissed) and then to Illinois, where Kankakee police lodged against him a misdemeanor traffic charge to which he eventually pleaded guilty, but not before his fourth and fifth failures to appear, both of which resulted in warrants, with the first having been served and the second having been quashed. The year of court supervision he received for this offense is one of his bright spots: He appears to have completed it satisfactorily in October 2014 with no reported violations.

Unfortunately, Defendant had picked up another criminal charge before imposition of sentence in the Kankakee traffic case. It is not clear whether the Illinois court in the Kankakee case knew of this September 19, 2012 arrest – just 25 days after the initiation of the Kankakee traffic case – in yet another state: Georgia. By the time this matter in Atlanta was over, Defendant was convicted in February 2015 of misdemeanor reckless conduct and shoplifting charges, and he racked up his sixth failure to appear, generating a bench warrant in December 2013. He apparently had returned to Illinois during the pendency of the Georgia case, because his record includes an Illinois arrest in September 2014 in a matter in which no charges were filed.

Also, before the 2015 disposition of his Georgia case, Defendant's interstate travel took him to another state, Texas, where he was arrested in Caldwell County in October 2014. The underlying offense is not clear from the record supplied to the Court, but the record indicates that in November 2015, Defendant was convicted of a Texas misdemeanor offense described as "bail jumping" and/or "failure to appear," which the Court counts as at least his seventh failure to appear, and which resulted in a probationary disposition that in November 2016 was discharged unfavorably. We do not have more detail and do not count this unfavorable discharge of probation in our tally of failures to appear, but it is further evidence of Defendant's difficulty in following court orders.

In 2016, Defendant's record indicates he had landed in the Seattle, Washington, area where he was arrested in June of that year on the misdemeanor weapons charge described above. The Court counts the still-active warrant in that case as failure to appear number eight. Moreover, upon his release in the Seattle case, he returned to Illinois, where police in the town of Cicero arrested him on a misdemeanor drug paraphernalia charge only two days after the Seattle failure to appear.

8

Less than a month later, in the Cicero drug paraphernalia case (which was later dropped), Defendant failed to appear in court, resulting in another warrant that was executed against him. We count this October 2016 failure to appear as his ninth (though there could be more) documented failure to appear since 2008. Only four months later, he was arrested again in Cicero in a case that resulted in an April 2017 guilty plea to a charge described as "obstructing identification." In all, Defendant's criminal history includes four misdemeanor convictions (including "obstructing identification and "bail jumping") and one felony conviction (the Michigan assault), but again, the Court is more concerned with Defendant's multiple failures to appear than it is with the relative seriousness of Defendant's criminal convictions.

### b. Defendant's Other Miscellaneous Characteristics

Before we discuss Defendant's mental health condition, a few other characteristics bear noting. None weighs in favor of a finding that a set of release conditions could reasonably assure his appearance. Defendant reports prior recent employment but no steady employment record, which is not surprising, given his having zig-zagged across the country since at least 2010 until roughly 2016. His residency has been mostly with his mother at two addresses in Chicago over the past 16 years, but his frequent travel to different parts of the country indicates an ability and a willingness to leave the judicial district on short notice and for extended periods. He reports having last worked as a dishwasher in Kentucky in or about 2013 or 2014 (his mother reports even more recent employment in the Chicago area), which would have been around the time he was found in Illinois, Texas, and Georgia by law enforcement. There is also information reported by Pre-Trial Services about a history of substance abuse, though some of that information is conflicting. Minimally, Defendant has reported that medical treatment he received very recently included the administration of methadone. The Court will not delve further into the question of substance abuse

9

on this record, except to say that the record supplied to the Court contains enough evidence of a problem to suggest further doubt about Defendant's stability for purposes of whether release conditions could reasonably assure his appearance.

c.       **Defendant's Mental Health**

The greater concern for the Court, as among Defendant's personal history and characteristics, is his mental health.  The information is sensitive and will not be recited extensively here, but the Court will state that information it has reviewed indicates that Defendant has a deeply troubled history of mental health problems.  Defendant did not propose release into a particular treatment program or institution, nor did he attribute the offense conduct – which he denies – to mental health issues.  He did allege, through counsel, in rebuttal to the government's argument that his treatment history suggests he might be "better off" in the MCC,[3] that officials at the Chicago MCC sharply reduced his medications in a manner that caused him to have a seizure.  The government stated that the detention hearing marked the first time it had heard of these allegations, to which it was not prepared to respond.  The instant record therefore contains not enough information for the Court to make judgments about whether the MCC is attending to Defendant's serious medical needs; instead, the Court takes judicial notice that MCC officials are under federal constitutional obligations to attend to those needs, and that the MCC is equipped with a medical unit and trained physicians whom the Bureau of Prisons has described in the past as capable of attending to prisoners' physical and mental health needs. On this record, the Court views Defendant's allegation about his treatment as serious and worthy of further monitoring by the Court, but insufficient for today's purposes to prompt Defendant's release in the face of the Court's

---

[3] With presumptively innocent pre-trial detainees' liberty being "the norm," *see Salerno*, 481 U.S. at 755, a pre-trial detainee will rarely if ever be "better off" in a jail.  But on narrower questions such as medical care, it is possible that in a particular case, the quality of care a defendant might receive in custody could be an improvement over the quality of care available to him or her in the community.

findings that the government met its burden to show that no conditions will reasonably assure Defendant's appearance per Section 3142(e) of the Bail Reform Act.

First, the record reflected in the confidential Pre-Trial Services report shows Defendant receiving mental health treatment and being prescribed medications on and off for at least the past four to five years, including recent care at a North Side counseling center three days per week, and a conversation with a psychiatrist as recently as May 21. The report reflects questions about the effectiveness and consistency of his treatment. This information, coupled with the incomplete information about the MCC's approach to Defendant's treatment since his arrest, is insufficient on the current record to establish that he cannot receive appropriate treatment in MCC custody. *See United States v. Hunter*, No. 13-CR-521-LTS, 2014 WL 6632965, at *2 (S.D.N.Y. Nov. 24, 2014) (refusing to re-open detention hearing and finding that defendant had not demonstrated that Bureau of Prisons treatment resources available in custody for his mental condition were inadequate or that he could not be treated in the Bureau's custody).[4]

Second, the alleged offense conduct here, an arson involving a Chicago police vehicle during a downtown demonstration, is alleged to have happened notwithstanding the mental health treatment and medication Defendant reports receiving very recently, and at a time when Defendant asserted at hearing that his life has entered a new, more stable phase as he has lived with his proposed third-party custodian (his mother) in the Pilsen neighborhood. The weight of the evidence against Defendant in this case (the second of the Section 3142(g) factors), discussed

---

[4] At hearing, the Court stated that it is asking the U.S. Marshal's Service and the Bureau of Prisons to ensure that Defendant receives appropriate care for his serious medical needs, including his mental health. The Court is ordering a status report at the scheduled preliminary hearing on June 10, 2020. That status report should address Defendant's allegation at hearing that he has been harmed by what he says is a decision at MCC to "wean him off" medications he believes he needs to avoid suffering from seizures or enduring other adverse health consequences. The government is being ordered to transmit this opinion to the warden of the MCC.

further below, is very strong, even though Defendant disputes it. Given the strength of the evidence that Defendant set this alleged arson fire during this more stable period in his life under his mother's roof, his proposed custodianship with her does not block the government from meeting its preponderance burden on the question of flight risk. The record also indicates, before this purportedly more stable period, his extensive and nomadic interstate travel (noted in detail above) during which he was domiciled with his mother and during which he picked up multiple criminal charges and multiple failures to appear in court. The Court has sympathy for Defendant's mother, who appears to have expended much effort in support of his well-being, but the record here shows that he is much to handle – too much under these circumstances to give the Court adequate comfort that release conditions, even those mandating mental health and/or substance abuse treatment out of custody, will reasonably assure his appearance in court as required.

The Court is highly sensitive to the substantial possibility that Defendant's past criminal conduct and failures to appear, along with the conduct of which he is accused in this case, may well stem in large part from the severity of his mental health and/or substance abuse problems. But the Bail Reform Act does not contain a mechanism for pre-trial release of a defendant whose personal characteristics render him a flight risk (with the government having met its burden on that issue under Section 3142(e)) where his underlying mental condition is a major component of those personal characteristics. The Bail Reform Act does not contain a third option (other than release or detention) for mandatory enrollment in a locked-down residential treatment program in the custody of the Attorney General. It allows only for release conditions to include mandatory mental health or substance abuse treatment, which the Court can order to take place at a specified institution, but this provision authorizes the Court merely to command that Defendant "remain" at that institution. 18 U.S.C. § 3142(c)(1)(B)(x). Such release to a locked-down private facility, even

if defendant is compelled not to leave except under the guard of U.S. marshals, still does not constitute detention under the Bail Reform Act because such conditions constitute terms of release and do not equate to court-ordered official detention. *See also Reno v. Koray*, 515 U.S. 50, 52-53, 64 (1995) (holding that habeas petitioner's time spent on release pending sentencing, at community treatment center where order required him to be "confined to the premises" without "authorization to leave for any reason" unless accompanied by a government agent, was not "official detention" for purposes of calculating time-spent-in-custody incarceration credit); *Nagib v. Conner*, No. 99-40450, 1999 WL 684168, at \*1-4 (5th Cir. Aug. 13, 1999) (holding that where pre-trial detainee was released to an inpatient hospital treatment program and was compelled to "remain" in the program until his discharge, whereupon the U.S. Marshal was to be present and "to deliver the body" of petitioner to the court was not entitled, the detainee per *Koray* was not entitled to credit for time served in that program except for time as to which district court affirmatively misled him as to whether he would receive sentence credit). With the Court finding that detention here is appropriate under Section 3142(e), and with the Court unable to detain Defendant, under the Bail Reform Act, to a specified mental health or substance abuse treatment facility, the Court is remanding Defendant into the custody of the U.S. Marshal's Service, which will keep him in official custody at a federal detention facility. When criminal defendants are ordered detained under Section 3142(e), federal constitutional due process requires that as pre-trial detainees, they must be provided with adequate medical care while they are in official custody. *Jackson v. Illinois Medi-car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002).

At least one court has labeled as an "unfortunate consequence" the need to hold presumptively innocent persons (who are awaiting trial and are not yet convicted of the charged offense) who have mental health problems, sometimes for extended periods, to allow for their

mental evaluation for competency to stand trial under 18 U.S.C. § 4241. *United States v. Lewis*, 5 F. Supp. 3d 515, 530 (S.D.N.Y. 2014). Where pre-trial detention complies with the Bail Reform Act and the Constitution, the detention is lawful, however troubled a court might be – and as this Court is – about detaining mentally ill persons. *Id.* at 533. Federal judges are not legislators. Although they can interpret and apply statutes to situations where the statutory language's direction is less than clear, much as a platoon leader might interpret a garbled battlefield communication, *see* Richard A. Posner, *Legal Formalism, Legal Realism, and the Interpretation of Statutes and the Constitution*, 37 Case W. Res. L. Rev. 179, 190–91 (1987), they cannot themselves rewrite the Bail Reform Act to accommodate better the needs of severely mentally ill pre-trial detainees. The Court can only urge the U.S. Marshals Service and the Bureau of Prisons to provide Defendant with all the appropriate medical treatment he requires, consistent with its constitutional obligations.

### 2. Weight of the Evidence Against Defendant

This Court previously has described this second of the Section 3142(g) factors as the least important. *See United States v. Radick*, No. 05 CR 798-2, 2006 WL 436116, at *2 (N.D. Ill. Feb. 17, 2006). But the "weight of the evidence" factor can take on greater importance in particular factual settings. The weight of the evidence has specific importance in this case.

As noted above, the weight of the proffered evidence here is strong, insofar as the government claims, although before the discovery process, that it found the clown mask at Defendant's home and that his neck tattoo matches the neck tattoo shown on the photograph showing the person with the clown mask standing in front of the burning police vehicle. Here, the timing of the alleged offense coincides with a period in which he was receiving mental health treatment and was in a residential situation that he describes as providing stability sufficient to

allow the Court to find that release conditions will reasonably assure his appearance. To evaluate Defendant's bid for release into the custody of his mother at her home, the Court must look closely at the weight of the evidence to determine whether it is strong enough to indicate that preponderance of the evidence weighs in favor of or against release on that condition. If the weight of the evidence strongly indicates that Defendant burned the police vehicle while under mental health treatment and while in the unofficial custody of his mother, Defendant's argument for custodial release to her will be that much less persuasive.

The Court is by no means resolving the parties' dispute about whether Defendant was the person who lit the police vehicle on fire. The Court is not considering the admissibility of Defendant's post-arrest statements, which defense counsel indicated will be the subject of a motion to suppress. The Court at this phase only considers the weight of the evidence within the context of Section 3142(g) and whether a set of conditions may be fashioned to reasonably assure his appearance in court – or, perhaps more accurately, whether the government can meet its burden of showing that no such conditions may be fashioned under all the circumstances here.

The Court has reviewed the government's tendered exhibits in this matter, including the photographs that appear in the Complaint and the four-second video. At hearing, the Court correctly stated that the video does not show the moments leading up to the person in the clown mask standing at the rear of the police car with his hand in the gas tank area. After the hearing, the Court examined the video more closely to consider what it added to the weight of the evidence. And the Court could reach no conclusion other than that the video is indeed quite damning. First, the person is standing at the rear of the vehicle with his hand in the gas tank area for a full four seconds. That may not seem like a long period of time, but it is longer than one might expect if the person depicted just happened to be passing by or walking in the area of the police car. The

video shows the person – whom the neck tattoo and the recovery of the mask indicate was Defendant, not some other person – with his hand in the gas tank opening the entire time. Second, a lick of flame is clearly visible from within the gas tank opening as the person's hand is shown in that opening. Third, although other persons are visible near the police vehicle, none is anywhere near the gas tank opening for any of the four seconds, and none has a hand inside the gas tank opening while flames are visible in that opening – only the masked person's hand is in that gas tank opening. Setting aside then the questions Defendant has raised over the reliability and admissibility of admissions he is said to have made about his being the masked man, the weight of the evidence – including law enforcement's recovery of the mask and clothing from his residence, the neck tattoo, the photos, and perhaps most notably the video – is not just "strong." It is extremely strong.

Accordingly, while the Court affords respect to Defendant's denial at this stage that he was the person who lit the fire, the weight of the evidence is strong enough here to defeat his argument that release under conditions will reasonably assure his appearance given his long record of failures to appear, where his proposed release would be into the same or a similar living situation he had at the time of the May 30 incident, amid mental health counseling or treatment, which he already was receiving before the incident.

### 3. The Nature and Seriousness of the Charged Offense

The charged offense here, arson under 18 U.S.C. § 844(i), is unquestionably a serious offense, insofar as the destruction of property by fire is a violent act. Apparently only the police car was destroyed by fire here. But although some arson fires may be more dangerous than others, fires in urban areas with buildings nearby (no matter whether the record discloses how close those buildings were to the fire) carry an "inherent danger of injury to other persons." *United States v.*

*Hicks*, 106 F.3d 187, 191–92 (7th Cir. 1997). The Seventh Circuit in *Hicks* was speaking of burning buildings being near other buildings, as opposed to a police vehicle burning in the middle of Chicago's downtown block of State Street during a bustling demonstration, but the common-sense conclusion in *Hicks* about the inherent danger fire poses to persons applies here. The government has proffered that the fire here put hundreds of persons at risk and distracted the city's police and fire suppression resources at a time of intense protest, further putting public safety at risk. The statutory maximum sentence for the arson charged here is 20 years. The charged offense here was obviously serious and inherently dangerous to others. The government added that Defendant's apparent nonchalance,[5] as evidenced by his rolling a cigarette and posing for photos near the burning police car, made his conduct all the more reckless and dangerous. In any event, the seriousness of the offense conduct is not in real dispute.

> **4.    The Nature and Seriousness of the Danger That Release Might Pose To Any Other Person or the Community.**

As far as whether the government meets its burden of establishing that no set of release conditions will reasonably assure Defendant's appearance in court as required, triggering detention under Section 3142(e), this factor has lesser importance. In determining the government met its

---

[5] The clown mask cannot go without further mention, because it could be evidence of an intent to conceal Defendant's identity during the incident and to make his apprehension more difficult. The mask was referred to in the Complaint as a "joker" mask. Information supplied to the Court since the arrest includes Defendant's having self-reported that he has gone by the name "The Riddler" in the past. The Court does not place an excessive amount of weight in the fact that Defendant appears to have referred to himself in this manner. But given that the detention motion implicates both flight risk and community safety, the Court at least notes that "The Riddler" was a villainous character in the fictional DC Comics story of "Batman," featured in comic books, movies, and television programs. *See* Christina Chung, *Holy Fandom, Batman! Commercial Fan Works, Fair Use, and the Economics of Complements and Market Failure*, 19 B.U. J. Sci. & Tech. L. 367, 398 (2013); Cathren Page, *An "Astonishingly Excellent" Solution to Super-Fake Narratives*, 58 Washburn L.J. 673, 683 (2019). The fact that a defendant who has called himself "The Riddler" stands accused of lighting a police car on fire during a Loop demonstration while wearing a clown-like mask and posing for photographs immediately afterward is, at the very least, troubling in a context in which the Court is considering the degree to which Defendant can be trusted to respect laws and Court-imposed requirements in order that he be released into the community pending trial in this case.

burden of showing that no release conditions would reasonably assure Defendant's appearance in court, the Court considered the nature and seriousness of the danger that Defendant's release might pose to the community, in conjunction with the weight of the evidence and the dangerous nature and circumstances of the offense.

\* \* \*

Applying the Section 3142(g) factors to the government's motion for detention, and Defendant's opposition to that motion, the Court grants the motion and finds that the government has met its burden, by a preponderance of the evidence,[6] that no set of release conditions will reasonably assure Defendant's appearance in court as required, making detention appropriate under Section 3142(e).  Defendant's personal history and characteristics overwhelmingly indicate a significant lack of stability in his life.  He lacks stable employment.  His residential situation has been highly nomadic, and his travel to multiple states has coincided with his repeated failures to appear in court and failures to comply with court orders, during a time frame in which he was domiciled with his proposed third-party custodian.  He failed to complete his probation satisfactorily on his only felony conviction, the 2010 matter in the state of Michigan.  His convictions include "bail jumping" and "obstructing identification," and he left the State of Washington in 2016 with his misdemeanor weapons charge pending and a warrant pending even now for his non-appearance in that case.  The Court can find insufficient reason to believe that with his record of not complying with judicially imposed requirements, in five different states during an eight- to 10-year period, he will appear in court as required in this case no matter what

---

[6] The preponderance-of-evidence burden is lower than the statute's "clear and convincing" standard that applies to whether no set of release conditions will reasonably assure the safety of the community.  *See In re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010) ("[P]roof by a preponderance of the evidence means that the 'trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question.'") (citing *Am. Grain Trimmers, Inc. v. Office of Workers' Comp. Programs*, 181 F.3d 810, 817 (7th Cir. 1999)).

release conditions the Court might impose. The only issue giving the Court serious pause is his troubled mental health and substance abuse history, but as the Court discussed above, the Court has concluded that it cannot order Defendant's release under any theory that mandatory mental health treatment, as a release condition, will reasonably assure his appearance.

### B.     The Safety of Any Other Person and the Community

Because the government has met its burden on the question of whether release conditions may be fashioned to reasonably assure Defendant's appearance in court, the Court need not reach, and declines to reach, the issue of whether the government showed by clear and convincing evidence that no such conditions will reasonably assure the safety of any other person and the community. Today's order is entered without prejudice to the question of community safety as it relates to detention or release of Defendant.

<strong>CONCLUSION</strong>

Having found that the government demonstrated by a preponderance of evidence that no release condition or set of conditions will reasonably assure Defendant's appearance in court as required, the Court grants the government's detention motion under Section 3142(e) and enters this Memorandum Opinion and Order in support of its Detention Order.


**SO ORDERED.**

ENTER:

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED:**      **June 9, 2020**

19