# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 20-cr-00260-1 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| TIMOTHY O'DONNELL ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Timothy O'Donnell has been indicted on one count of maliciously damaging and destroying, and attempting to damage and destroy, a Chicago Police Department ("CPD") vehicle used in interstate commerce by setting it on fire, in violation of 18 U.S.C. § 844(i). (Dkt. No. 16.) Specifically, the Government claims that during the May 30, 2020 protests in Chicago following the police killing of George Floyd, O'Donnell placed a lit object in the gas tank of a police car. Now before the Court is O'Donnell's motion to suppress statements he made during his custodial, post-arrest interview. (Dkt. No. 32.) O'Donnell claims that during his interview, he invoked his right to counsel under the Sixth Amendment to the United States Constitution but the officers ignored the request and continued interrogating him. For the reasons stated below, the motion is granted in part.

## BACKGROUND

The Government contends that on May 30, 2020, an individual wearing a "Joker" clown mask approached a CPD car near 200 North State Street in Chicago and intentionally set it on fire by placing a lit rag in its gas tank. On June 2, 2020, law enforcement officers searched O'Donnell's apartment pursuant to a search warrant and found a Joker mask like the one worn by the perpetrator. Officers arrested O'Donnell that same day and conducted a post-arrest interview. The entire June 2 interview between law enforcement and O'Donnell is recorded on video. (*See*

Video Ex.: Timothy O'Donnell Custodial Interrogation (June 2, 2020) (on file with Court) ("Video Ex.").) The Court summarizes the interview as shown on the video below.

One minute into the interview an officer wearing an "FBI" (Federal Bureau of Investigation) vest enters the empty interrogation room with O'Donnell, sits O'Donnell down at the table, removes his handcuffs, re-cuffs one of his hands to a bar on the wall, and then leaves. (*Id.* at 1:15–2:23.) Approximately thirty minutes later, three officers enter the room. (*Id.* at 36:19–36:30.) The first introduces himself to O'Donnell as a special agent with the FBI and tells O'Donnell that the other two men are CPD detectives. (*Id.* at 36:27–36:34.) During O'Donnell's interrogation, the FBI agent is sitting directly across from him, one of the CPD officers is seated next to the FBI agent, and the other CPD officer is standing.

The FBI agent gives O'Donnell a piece of paper and a pen. (*Id.* at 36:19–37:17.) After removing O'Donnell's handcuff (*see id.* at 37:17–37:48), the FBI agent advises O'Donnell of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), to remain silent, to speak to an attorney, to have an attorney present during his questioning, to have a court-appointed attorney if he cannot afford one on his own, and to stop answering the officers' questions at any time. (Video Ex. at 37:50–38:25.) O'Donnell asks the officers to repeat those rights, and the FBI agent does so. (*Id.* at 38:25–39:00.) O'Donnell then initials the paper in front of him to indicate that he has been advised of his rights. (*Id.* at 38:55–39:10.) At the officer's request, O'Donnell reads the following statement out loud: "I have read this statement of my rights and understand what my rights are at this time. I am willing to answer questions without a lawyer present up until I feel necessary to cut off." (*Id.* at 39:10–39:30.) Finally, O'Donnell signs the form. (*Id.* at 39:30–39:50.)

After O'Donnell signs, the FBI agent asks him if he is doing okay and whether he is on any drugs or alcohol. (*Id.* at 39:55–40:04.) O'Donnell lists the prescription drugs he is taking at

2

that time, including an anti-anxiety and anti-convulsant drug, a psychotropic drug, and methadone. (*Id.* at 40:05–41:00.) When the FBI agent asks O'Donnell whether he feels okay to proceed and whether he understands that he is talking to law enforcement, O'Donnell answers that he does. (*Id.* at 41:00–41:13.)

The video shows that, around twenty minutes into the interview, the FBI agent showed O'Donnell a photograph of the person believed to have lit the rag to set the police car on fire. (*Id.* at 55:46–56:24.) At the Court's direction, the Government submitted a supplemental filing (*see* Dkt. No. 49), explaining which photograph officers presented to O'Donnell at that point in the interview. Having reviewed the supplemental submission, the Court observes that the relevant photograph shows a person in a clown mask sitting on a bridge above the words "KILL COPS," which appear spray-painted on the bridge. (*See* Photograph 1 (on file with Court).) The video shows the officer pushing the photograph towards O'Donnell, who comments, "Yes, that is me, and they so nicely got me um- with uh- it's all exploitation of image. See 'kill cops' and then an image of me as the clown." (Video Ex. at 56:11–56:24.) The FBI agent then asks O'Donnell, "So if that's you, could you just initial saying that this is you, as we're talking about here?" (*Id.* at 56:24–56:30.) O'Donnell clarifies, "You want to- you just want to make the correlation of me as that man in the-?" (*Id.* at 56:30–56:35.) When the FBI agent answers, "Yeah, just you saying that 'yes, this is me in the picture,'" O'Donnell states, "I would prefer not to sign any kind of documents." (*Id.* at 56:36–56:42.) The FBI officer says that is fine and that he will not force O'Donnell to sign. (*Id.* at 56:42–56:47.) The CPD officer standing then asks O'Donnell, "But is that you?" (*Id.* at 56:47–56:49.) O'Donnell answers, "I'm in fear. I'm not going to say anything further on that matter without a lawyer present." (*Id.* at 56:49–56:56.) The FBI agent says, "Okay," passes another photograph to O'Donnell, and continues, "Then can we talk about this

one?" (*Id.* at 56:56–56:59.) That next photograph shows the person in the clown mask standing next to a CPD car with his hand close to the gas tank. (*See* Photograph 2 (on file with Court).) O'Donnell states:

> This is an image with the- the- the man in question is being told, you know, by a photographer to check- to check this out, 'hey, look what's going on,' like, I mean, not 'look what's going on,' it's- he wanted an image, and that's the image he got. He wanted that specific image.

(Video Ex. at 57:00–57:25.) The FBI agent then asks O'Donnell, "Somebody told you to pose like this?" and O'Donnell answers "Yes, one specific photographer in particular." (*Id.* at 57:25–57:31.)

After discussing the May 30, 2020 incident and the photographs for another fifteen minutes or so, the FBI agent asks O'Donnell, "What if we told you we have witnesses that say you're dancing and having a good time and enjoying yourself and not moving in fear?" (*Id.* at 1:14:00–1:14:09.) O'Donnell answers, "That's all what an attorney and a court of law- when they are- to be brought up." (*Id.* at 1:14:09–1:14:18.) Over the next few minutes, O'Donnell continues to answer the officers' questions by denying his involvement in lighting the CPD car on fire. The FBI agent suggests they "dial it back a minute," and at O'Donnell's request, one of the CPD officers gets up to get him another cup of water. (*Id.* at 1:15:19–1:15:27.) But O'Donnell continues saying to the FBI agent, "I stand by that. No way, no how. The instigation or- or persistent like, inciting any kind of riot or damage to government property or anything of that sort is- no." (*Id.* at 1:15:27–1:15:41.) The FBI agent responds, "Okay. Okay. We'll- you know, we'll talk more about that," and O'Donnell continues, "And those- and that all comes up, that's- that's- a lawyer needs to be present because I do not stand for the exploitation of me and using me as a puppet to create an image." (*Id.* at 1:15:41–1:16:03.) As the CPD officers return to the interrogation room, O'Donnell continues speaking for more than a minute without response from

any of the officers. (*Id.* at 1:16:03–1:17:25.) Specifically, O'Donnell says that he does not support inciting riots, that "it was supposed to be a peaceful protest," and that he was there helping to bandage people who were injured by other protestors. (*Id.*) The FBI agent eventually suggests that O'Donnell "take a deep breath, take a sip of water," and asks him about one of his tattoos. (*Id.* at 1:17:23–1:17:49.)

Later, while the officers are showing O'Donnell the surveillance video of the perpetrator lighting a rag on fire near the CPD car, he says,

> And that's where, like, if it keeps on going down that road where it's like, I'm being pin-pointed for the lighting of- of a government vehicle, that's where I call a lawyer, because I did not do that. And if that's what your main objective is through this talk, is that, I mean . . .

(*Id.* at 1:30:36–1:30:56.) The CPD officer standing then asks his fellow officer to go to a certain part of the surveillance video, and O'Donnell continues,

> And I will let you know that I am not a man who will- will abscond, because I take medications that- that- that pretty much keep me where I need to be. I am under- my mother is completely under my surveillance. I am here to be found. I am here to be questioned at your demand. I did not light that cop car on fire.

(*Id.* at 1:30:56–1:31:21.) One of the officers then tells O'Donnell that they are going to go through some additional images with him, and O'Donnell says, "thank you." (*Id.* at 1:30:21–1:31:27.)

After almost two hours of questioning, officers ask O'Donnell questions about videos from the protest that he may have saved on his phone and his social media. O'Donnell explains that he does not want to provide any more information before speaking to an attorney. (*Id.* at 2:17:09–2:17:41.) The officers tell O'Donnell that they will stop asking him questions. (*Id.* at 2:17:41–2:17:44.) The FBI agent gives O'Donnell a form to sign, acknowledging that it is too late in the day to bring him before a judge, so he will have to go to court the following day. (*Id.* at

2:17:44–2:18:02.) The agent also tells O'Donnell that he will be in custody that night. (*Id.* at 2:19:00–2:19:05.) After reading through the form, O'Donnell signs it. (*Id.* at 2:20:30–2:21:21.) The officers leave the interrogation room and, around twenty minutes later, another individual enters to escort O'Donnell out. (*Id.* at 2:42:00–2:42:40.)

## DISCUSSION

O'Donnell now argues that he unambiguously invoked his right to counsel during his interview but law enforcement officers ignored his request and continued with the interrogation. O'Donnell requests that the Court suppress any statements he made in his June 2 interview after he invoked counsel.

Under *Miranda*, law enforcement officers must inform individuals subject to custodial interrogations that they have the right to consult with an attorney before answering any questions and that they have the right to have an attorney present during the questioning. 384 U.S. at 471–72. When a suspect invokes his right to counsel, the interrogation must stop unless the accused himself initiates further conversation with police. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). A suspect initiates further conversation under *Edwards* when, not in response to further questioning, the suspect makes a statement demonstrating that he is willing to continue discussing the investigation. *United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009). "The *Edwards* rule is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Montejo v. Louisiana*, 556 U.S. 778, 787 (2009) (internal quotation marks omitted). But police are only obligated to stop questioning if the suspect's invocation of his right to counsel is clear and unambiguous. *United States v. Hampton*, 885 F.3d 1016, 1019 (7th Cir. 2018) (affirming that the defendant's statement "I haven't even had a right to counsel or anything" was merely an observation and did not unambiguously invoke his right to an attorney).

And the burden is "on the suspect to make a clear and unambiguous assertion of his right to counsel to stop questioning." *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009) (internal quotation marks omitted).

The Seventh Circuit has encouraged—but not required—law enforcement to clarify whether a suspect wants an attorney after an ambiguous request. *See United States v. Wysinger*, 683 F.3d 784, 795 (7th Cir. 2012) (finding that the defendant's initial request for an attorney "Should I get a lawyer?" was ambiguous and officers were not required to ask clarifying questions, but suppressing defendant's later statements because of a subsequent, unequivocal request); *see also Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (finding that because the defendant did not unambiguously invoke his right to silence by remaining silent for two hours and forty-five minutes, police were not required to end the interrogation or ask clarifying questions). Nonetheless, "[e]ven if a suspect does not invoke his *Miranda* rights, his self-incriminating statements cannot be used against him in court unless the Government shows by a preponderance of the evidence that he voluntarily waived these rights." *United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018).

In deciding whether a suspect has invoked his right to counsel, courts look for "'some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *United States v. Martin*, 664 F.3d 684, 688 (7th Cir. 2011) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). The statement must also "indicat[e] a certain and present desire to consult with counsel." *United States v. Hunter*, 708 F.3d 938, 943 (7th Cir. 2013). For instance, in *Hunter*, the Seventh Circuit found the defendant's request, "Can you call my attorney?" sufficiently invoked his right to counsel, noting especially the use of the direct word "can," rather than an equivocal word like "should" or "might." *Id.* at 943–44; *see also Davis*, 512 U.S. at 455,

462 (affirming that the defendant's statement, "Maybe I should talk to a lawyer" was too ambiguous to invoke the right to counsel, especially when the officers followed up and the defendant clarified that he was not asking for a lawyer).

Further, even an unambiguous request for counsel "serves as an absolute prohibition on further interrogation only if an accused invokes his right to counsel for all purposes." *Martin*, 664 F.3d at 688 (citing *Connecticut v. Barrett*, 479 U.S. 523, 529–30 (1987); *United States v. Spruill*, 296 F.3d 580, 588 (7th Cir. 2002)). In *Martin*, the Seventh Circuit affirmed the denial of a motion to suppress the defendant's incriminating spoken statements when he had responded to a request to provide a written statement by saying, "I'd rather talk to an attorney first before I do that." *Id.* at 688–89. The court emphasized the qualifier "before I do that," referring to making a written statement and found that the defendant did not absolutely prohibit further oral interrogation. *Id.* In making that finding, the Seventh Circuit considered that the defendant was responding directly to a request to make a written statement, he signed an additional waiver of his *Miranda* rights after that request, and then answered officers' questions. *Id.* at 688–89; *see also Barrett*, 479 U.S. at 525 (finding that the defendant had waived his right to have counsel present where he indicated that he would not make a written statement without an attorney present but that he had "no problem" talking to police); *Spruill*, 296 F.3d at 588 (finding that the defendant's "conditional request" for an attorney before taking a polygraph exam did not require the police to stop asking questions). If a suspect makes a request for counsel that is less than all-inclusive, courts should interpret his request broadly. *Barrett*, 479 U.S. at 529–30; *Hunter*, 708 F.3d at 942; *Smith v. Endell*, 860 F.2d 1528, 1529 (9th Cir. 1988).

Here, O'Donnell's first statement, "I'm not going to say anything further on that matter without a lawyer present," (*see* Video Ex. at 56:49–56:56), is the subject of his motion to

suppress. O'Donnell contends that any statements he made after that point in the interrogation must be suppressed under *Edwards* because the police were required to stop questioning him. The Government, in contrast, compares the present case to *Martin*, in which the Seventh Circuit found the defendant's request, "I'd rather talk to an attorney first before I do that" was "unambiguous in light of the circumstances," but "clearly limited to written statements." 664 F.3d at 688–89. In comparison to *Martin*, O'Donnell's statement was an even stronger invocation of his right to counsel. Where the suspect in *Martin* merely said that he would "rather" speak to counsel before putting anything in writing, O'Donnell firmly asserted that he would not continue speaking about "that matter" without a lawyer. But unlike *Martin*, where the qualifier "before I do that" was clearly in response to the request to provide a written statement, O'Donnell's reference to "that matter" is more ambiguous and open to more than one reasonable interpretation. O'Donnell contends that the request was all-inclusive and barred any ongoing questioning, while the Government asserts that the request was limited to signing or initialing the photograph.

The Court finds neither of those interpretations reasonable under the circumstances. Just before O'Donnell's statement, he clarified that the officers wanted him to "make the correlation" between himself and the man in the photograph. When the FBI agent answered affirmatively, O'Donnell refused to sign. One of the CPD officers then asked him to respond orally whether it was him in the photograph. That is when O'Donnell answered, "I'm in fear. I'm not going to ***say*** anything further on that matter without a lawyer present." (Video Ex. at 56:49–56:56 (emphasis provided).) Putting O'Donnell's statement into context, the Government's claim that O'Donnell, like the suspect in *Martin*, limited his request to signing something, is unreasonable.[1] But

---

[1] While not dispositive, the Court notes a key difference between the circumstances of the interrogation in *Martin* and those here. In *Martin*, when the defendant stated, "I'd rather talk to an attorney first before I do that," the interrogating officer ended the interview. 664 F.3d at 687. Hours later, law enforcement officers from another jurisdiction arrived but were never informed that the suspect had already invoked his right to

9

O'Donnell's claim—that "the matter" meant the alleged crime generally—also goes too far, when he was clearly objecting to identifying himself as the man in the photograph. Looking at the situation as a whole, the only reasonable interpretations of "that matter" are the officers' attempts to identify O'Donnell as the man in that particular photograph or their efforts to identify him generally as the man photographed in the Joker mask.

Looking to the "ordinary meaning" of O'Donnell's statement in light of the circumstances, *see Martin*, 664 F.3d at 689, and interpreting his request broadly, as it must, *see Barrett*, 479 U.S. at 529–30, the Court finds that O'Donnell invoked his right to counsel for the purpose of identifying himself as the man wearing the Joker mask in all the officers' photographs and surveillance videos from May 30. In reaching this decision, the Court considers the context surrounding O'Donnell's invocation. Just before he refused to sign the photograph, O'Donnell clarified that the officers were asking him to "make the correlation" between himself and the man in the photograph. (Video Ex. at 56:30–56:35.) O'Donnell then refused to do so and when pressed further to confirm whether he was in the photograph, he invoked his right to an attorney. When officers turned to the next photograph, O'Donnell tried to avoid identifying himself by referring to the man pictured as "the man in question." (*Id.* at 57:00–57:25.) Officers then immediately sought to establish O'Donnell as that individual by asking him, "Somebody told you to pose like this?" to which O'Donnell answered yes. (*Id.* at 57:25–57:31.) Looking at O'Donnell's questions and statements to police both before and after he invoked his right to counsel, it is clear that he

---

counsel. *Id.* Those officers gave the suspect his Miranda warnings again, the suspect waived his rights, and then made an incriminating (spoken) statement. *Id.* The Seventh Circuit emphasized that there was no evidence of mischief or police coercion. "Rather, any alleged error by the law enforcement officers appear[ed] to derive from a simple, although troubling, lack of communication." *Id.* at 690. In this case, the officers interviewing O'Donnell pushed the interview forward even though his invocation of the right to counsel was stronger than that in *Martin*. Officers did not give him his *Miranda* warning again, and he did not explicitly waive those warnings again.

was requesting counsel for the purpose of answering questions that would identify him as the man photographed in the Joker mask.

While it is possible that O'Donnell's request was limited to discussing the first photograph, that interpretation is more unlikely and unfair when considering the content of the photographs in question. Both photographs show the suspect in the Joker mask taking part in the May 30 protests in downtown Chicago. If the first and second photographs that the officers presented to O'Donnell were more distinctive—for instance, if one showed the suspect wearing the mask and one without the mask—it might be reasonable to consider them different matters for questioning purposes. If anything, the first photograph appears less incriminating than the second, which shows the man in the Joker mask with his hand near the CPD car's gas tank. To apply O'Donnell's request for counsel only to the first photograph would be too narrow an interpretation of the request, particularly since an ambiguous request should be interpreted broadly.

At a telephonic hearing before this Court, the Government's attorney pointed out that shortly before O'Donnell's request for counsel, he had already identified himself as the man in the photograph. (*See id.* at 56:11–56:12 ("Yes, that is me . . . .").) While that appears to be accurate, it does not change the Court's present ruling. Notwithstanding that O'Donnell had already said something incriminating, he immediately bristled and invoked his right to counsel when officers sought to confirm his statement. The Government also emphasized that when officers presented O'Donnell with the next photograph, he began responding immediately. As discussed above, however, O'Donnell did respond but he also clearly tried to avoid identifying himself as the man in the photograph. Moreover, "an accused's ***postrequest*** responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request

11

itself." *Smith v. Illinois*, 469 U.S. 91, 100 (1984). Undergirding the *Edwards* rule is the understanding that even when a suspect invokes his right to counsel, interrogating officers are often able to "badger" him into waiving his right by continuing their questioning. *See Montejo*, 556 U.S. at 787. When O'Donnell invoked his right to counsel for the purpose of identifying himself as the man photographed in the Joker mask, officers continued with the same line of questioning. Though O'Donnell tried to answer their questions in such a way as to avoid identifying himself, police quickly obtained incriminating statements.

Accordingly, once O'Donnell invoked his right to counsel for the first time, the officers were required to stop asking questions that were "reasonably likely to elicit an incriminating response" from O'Donnell identifying himself as the man photographed in the Joker mask. *See Hunter*, 708 F.3d at 947 (internal quotation marks omitted). Alternatively, officers could have asked questions clarifying the "matter" to which O'Donnell was limiting his right to counsel. *See Endell*, 860 F.2d at 1529. The Government points out that the Supreme Court and Seventh Circuit have strongly encouraged but never required officers to clarify an ambiguous request for counsel before they cease their questioning. *See Berghuis*, 560 U.S. at 381; *Wysinger*, 683 F.3d at 795; *United States v. Hampton*, 675 F.3d 720, 726 (7th Cir. 2012). But in this case, O'Donnell's invocation of his right to counsel was unambiguous. He clearly stated that he would not continue speaking about a particular subject without a lawyer present. Only the extent of his qualification was open to reasonable interpretation. And though the FBI agent technically asked O'Donnell, "Then can we talk about this [photograph]?" (*see* Video Ex. at 56:56–56:59), the question was not actually intended to clarify O'Donnell's request—the officer did not ask O'Donnell to clarify what he meant or to explain the purposes for which he wanted an attorney; rather, the officer wanted to move past the request and get O'Donnell to keep talking about the same topic with

respect to which he had already invoked his right to counsel. Perhaps the interrogating officers would have been able to continue their desired line of questioning if they had heeded the courts' longstanding advice concerning "good police practice" by clarifying the scope of O'Donnell's request, *United States v. Lee*, 413 F.3d 622, 626–27 (7th Cir. 2005) (quoting *Davis*, 512 U.S. at 461). They did not do so.

## CONCLUSION

For the foregoing reasons, O'Donnell's motion to suppress certain post-arrest statements is granted in part. (Dkt. No. 32.) The Court suppresses any statements O'Donnell made after he requested counsel by stating, "I'm in fear. I'm not going to say anything further on that matter without a lawyer present," (that is, after timestamp 56:56 in the interrogation video) in response to questions reasonably likely to elicit responses identifying him as the man wearing the "Joker" mask in photographs and video footage of the May 30, 2020 protests.

ENTERED:

Dated: June 29, 2021

Andrea R. Wood
United States District Judge